In the court's view, notwithstanding the juvenile court's "passing references to child, it is evident that the court's focus was on mother and its desire to see her succeed, *1107 rather than the effects that delaying permanency would have on him." Id. at 134-35, 423 P.3d 88. Based mostly on the testimony and report of MacPhail, the court then determined that termination was in child's best interest. The court noted MacPhail's opinion that stability, permanency, and consistent care-giving are child's greatest needs and reasoned that child had been improving under the care of his uncle and aunt and that the transition to their care was "already well underway." Id. at 135-36, 423 P.3d 88.
Yet, the court determined, a permanent guardianship with child's foster parents was not an adequate means to establish the permanency that child needs. Id. at 136, 423 P.3d 88. According to the majority, the juvenile court had considered the permanent guardianship as a potentially temporary arrangement that would be inadequate to address MacPhail's concerns:
"[M]any of the concerns that MacPhail expressed would not be alleviated by making child's foster parents his guardians. That is, the various concerns regarding the stress of uncertainty and the consequences of delaying child's attachment to his permanent caregiver would still be present, but the delay would be in the transition back to mother, rather than to his guardians. MacPhail opined that, in the approximately two years that child had been in the care of his uncle and aunt, he had 'developed a very secure bond, particularly with his [uncle].' MacPhail explained that once that happens, a subsequent move to another caregiver can be extremely disruptive and stressful, and that the child's reaction to being separated from the foster parent can be quite traumatic. We recognize that there is likely some risk of that phenomenon occurring every time that a child rejoins his or her parents following a temporary placement;
**155 the question here, however, is whether, given child's already lengthy removal from his mother's care-together with the likelihood of an equal amount of future delay-it is in his best interests to leave open the possibility of a return to mother. We conclude that it is not."
Id. at 137, 423 P.3d 88 (internal footnote omitted).
Finally, the court reasoned, "the juvenile code expresses a legislative preference that children be placed in the most permanent setting suitable to their needs." Id. at 138, 423 P.3d 88. Accordingly, the court concluded that a permanent guardianship, although providing "some degree of permanency to child and potentially address[ing] a number of the concerns raised by MacPhail and others, * * * is not the most permanent placement suitable to child's circumstances." Id. at 138, 423 P.3d 88. The most permanent placement "suitable to child," the court said, was adoption by child's foster parents. Id. Placement with them, the court explained, "would alleviate all of the uncertainties attendant to any temporary placement, no matter how durable that placement may appear." Id. (emphasis in original).
Judge Ortega authored the dissent, and four other judges joined her. The dissent was not persuaded by the majority's assertion that it was not applying a presumption in favor of adoption; in the dissent's view, the majority had effectively done so by "concentrating its analysis entirely on the evidence that established mother's unfitness *** and in assuming that termination of mother's parental rights was the only way to address child's need for permanency." Id. at 144, 423 P.3d 88. The dissent recognized that mother is "not able to serve as a custodial resource," but, for the dissent, that did not mean that termination was necessary: "mother and child have a positive attachment," and "child is in a stable placement with his uncle and aunt." Id . Establishing a permanent guardianship with those foster parents, the dissent explained, citing ORS 419B.365 and ORS 419B.368(7), "would accomplish permanency that cannot be disrupted by mother." Id. at 145, 423 P.3d 88. The dissent would have affirmed the judgment of the juvenile court. Id.
Mother filed a petition for review in this court, which we allowed. In this court, the parties do not square **156 off, as they did in the Court of Appeals, about whether there is a statutory presumption that the rights of an unfit parent must be terminated when reunification *1108 within a reasonable time is not probable. Mother disputes the existence of such a presumption, but the department does not engage. Instead, the department argues that there is a legislative "preference" for adoption in that circumstance. That preference, the department contends, may not be dispositive, but it must be a significant factor in a juvenile court's determination of a child's best interest. The department argues that, when there is evidence that the termination of parental rights could have a potentially harmful effect on a child, a juvenile court may decide that termination is not in a child's best interest; but, in the absence of such evidence, the preference for adoption requires termination. Mother responds that the text of the relevant statutes does not provide either a presumption or a preference for termination; she contends that the juvenile court was correct in its conclusion that the department did not establish, by clear and convincing evidence,[6] that termination of her parental rights was in child's best interest. Child's best interest is served, mother contends, if his maternal uncle and aunt become his permanent guardians, providing him with permanency and maintaining his familial bonds.
ANALYSIS
The first question we must analyze is whether the statutory scheme contains a presumption or a preference for termination when a parent has been found to be unfit under ORS 419B.504. In analyzing that question, we begin with the relevant text. See State v. Gaines , 346 Or. 160, 171-72, 206 P.3d 1042 (2009) (stating methodology).
The statutory grounds for termination of parental rights are set out in ORS 419B.502 to 419B.524. ORS 419B.504, the statute on which DHS relies for termination in this case, provides that
**157 "[t]he rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change."[7]
ORS 419B.500, which is the focus of this case, includes an additional "best interest" requirement. It provides that,
"[t]he parental rights of the parents of a ward may be terminated as provided in this section and ORS 419B.502 to 419B.524, only upon a petition filed by the state or the ward for the purpose of freeing the ward for adoption if the court finds *1109 it is in the best interest of the ward."[8]
**158 ORS 419.500 thus "contemplates a two-stage analysis":
"The first stage focuses on the conduct of a parent, i.e. , the alleged statutory grounds for termination. The second stage focuses on whether the best interests of the child will be served by termination. In a termination proceeding, if a parent's conduct justifies termination, then the best interests of the child are considered explicitly, and could even then prevent termination from occurring."
State ex rel. Juv. Dept. v. Beasley , 314 Or. 444, 451-52, 840 P.2d 78 (1992) ;[9] see also State ex rel. Juv. Dept. v. Geist , 310 Or. 176, 189, 796 P.2d 1193 (1990) (issue in termination case is whether "the statutory grounds for termination have been established by clear and convincing evidence, and, if so, whether the child's best interest will be served by termination of the parent-child relationship" (citation omitted)).
That two-stage inquiry suggests that the legislature did not intend that establishing unfitness-a parent-focused consideration-would give rise to a presumption that termination is in a child's best interest-a child-focused consideration. Instead, as the department acknowledges, the legislature expressly contemplated that, even when a parent is unfit and reunification within a reasonable time is improbable, it may not be in a child's best interest to terminate parental rights. The department therefore does not press its original argument for a statutory presumption,[10] **159 and we turn to its alternative argument that statutory context provides a legislative "preference"-a preference for adoption .
Specifically, the department identifies ORS 419B.476(5) as establishing a hierarchy of preferred placements, with parental reunification as the most desirable option and adoption as the second most:
"(5) The court shall enter an order within 20 days after the permanency hearing. In addition to any determinations or orders the court may make under subsection (4) of this section, the order shall include the following:
"* * * * *
"(c) If the court determines that the permanency plan for the ward should be to return home because further efforts will make it possible for the ward to safely return home within a reasonable time, the court's determination of the services in *1110 which the parents are required to participate, the progress the parents are required to make and the period of time within which the specified progress must be made.
"(d) If the court determines that the permanency plan for the ward should be adoption, the court's determination of whether one of the circumstances in ORS 419B.498 (2) is applicable.
"(e) If the court determines that the permanency plan for the ward should be establishment of a legal guardianship, the court's determination of why neither placement with parents nor adoption is appropriate.
"(f) If the court determines that the permanency plan for a ward should be placement with a fit and willing relative, the court's determination of why placement with the ward's parents, or for adoption, or placement with a legal guardian, is not appropriate."
**160 The department asserts that paragraph (e) and (f)'s requirement that the juvenile court explain why reunification and adoption are not appropriate permanency options indicates that the legislature has a preference for adoption when reunification is not the appropriate plan. The department further argues that, by changing a child's plan to adoption at the permanency stage, a court already has determined that adoption is the plan best suited to the meet the child's health and safety needs, a determination that the department argues is relevant in a termination proceeding. Moreover, the department notes, once a permanency plan is changed to adoption, the department is statutorily required to file a petition to terminate parental rights and proceed toward adoption unless the opponent of adoption has proved the existence of a reason not to file the petition. ORS 419B.498(2)(b) ; Dept. of Human Services v. S. J. M. , 364 Or. 37, 53, 430 P.3d 1021 (2018). That is another clue, it is urged, that when reunification is not appropriate, the legislature prefers adoption and, the department seems to suggest, an indication that the legislature prefers termination of parental rights when a child's permanency plan is adoption.
The department is correct that when a court changes a permanency plan from reunification to adoption, the legislature contemplates that a petition for termination of parental rights will be filed. When a court determines that the appropriate permanency plan is adoption, ORS 419B.476(5) requires the court to enter an order providing for that plan, including whether, and if applicable, when the ward will be placed for adoption and a petition for the termination of parental rights will be filed. And ORS 419B.498(3) provides that no petition to terminate parental rights may be filed until after a court has conducted a permanency hearing and has determined that the permanency plan for the child or ward should be adoption. But, the fact that termination is contemplated does not mean it must be ordered. The statutes set out procedural and substantive requirements that still must be met before parental rights are terminated, and those requirements are different from those that apply in a permanency proceeding. In a termination proceeding, the department must prove all of the facts required for **161 termination, including that the best interest of the child will be served by termination. ORS 419B.500. After a hearing, a court may dismiss a termination petition and entertain a petition for permanent guardianship. ORS 419B.365(1). From the statutes that the department cites for its contextual argument, we do not discern the preference for termination that the department urges.
The legislative history is of no greater help. The "best interest" requirement of ORS 419B.500 was added as an amendment to House Bill (H.B.) 3200 in 1989. The representative who proposed the amendment explained that the best-interest requirement was the "traditional doctrine" but was not reflected in the termination statute as it was written. Audio Recording, House Committee on Judiciary, Subcommittee on Family Justice, H.B. 3200, Mar. 31, 1989 (statement of Rep. Kevin Mannix). A representative from the Department of Justice "strongly concur[red]" that H.B. 3200 should be so amended, explaining that requiring that termination was in the child's best interest was in case law and that it should be in the statute because termination should not occur merely *1111 to punish the parent. Audio Recording, House Committee on Judiciary, Subcommittee on Family Justice, H.B. 3200, Mar. 31, 1989, (statements of Deborah Wilson); Audio Recording, Senate Committee on Judiciary, H.B. 3200, Mar. 30, 1989 (statements of Deborah Wilson). As we understand it, that history demonstrates that the legislature viewed the best-interest inquiry as a consideration that is distinct and separate from the other grounds that the department must establish to obtain termination. We do not discern from that history the preference for termination that the department urges.
In short, there is no indication in the text of ORS 419B.500 that the legislature intended the "best interest" inquiry to be weighted with a presumption or a preference for termination. Nor is there any other support in the statute's context or legislative history to indicate that the legislature intended that, once the department has established parental unfitness and that reunification within a reasonable time is improbable, there is a preference for termination. Rather, ORS 419B.500 requires the juvenile court to **162 determine, from the evidence presented in the termination proceeding, whether termination is in the child's best interest.
That conclusion also answers the department's more nuanced argument that "the legislative preference for adoption would be dispositive only in the absence of any evidence that the termination of parental rights would have a potential harmful effect on the child." When a court determines that the permanency plan for a child is adoption and the department files a petition for termination, the department still must prove, at the termination hearing, that adoption and termination are in the child's best interest. If the evidence demonstrates that adoption and termination would have a potential harmful effect on the child, then that evidence may support a juvenile court's decision to dismiss the petition. And, when the department establishes that a parent is unfit and that reunification within a reasonable time is not probable, it may not be difficult for the department to meet that burden. Facts that demonstrate the parent's unfitness also may demonstrate that it is in the child's best interest that the parent have no further relationship with the child. So, for instance, if a parent has physically abused a child and the child continues to suffer trauma in the parent's presence, those facts alone may establish that it is in the child's best interest to terminate parental rights. But, when a parent and a child have a positive bond, more may be required. The department is not correct that the absence of evidence that termination will cause potential harm is sufficient to meet the department's burden of proof.
And the department also is incorrect in its related argument that, absent the construction for which it argues, ORS 419B.500 would require the department to disprove the suitability of a permanency plan other than adoption in every case. Under ORS 419B.500, termination does not turn on the appropriate permanency plan. It is true that, in a termination proceeding, a parent may contend that a child's best interest can be met without termination and adoption. If the parent does so, the availability of another permanency plan that will advance the child's best interest, such as a permanent guardianship, may be a factor in a court's decision. But regardless of whether a parent takes **163 that tack, the department's burden remains the same: The department must prove only that that the parent's conduct justifies termination and that the best interest of the child will be served by termination.
Having concluded that that statutory inquiry requires consideration of the evidence presented, without reliance on a statutory presumption or preference, we turn now to the evidence presented in this case and whether it established that termination of mother's parental rights is in child's best interest. The juvenile court weighed that evidence and permissibly concluded that it did not; child had an interest in maintaining maternal familial relationships, and his interest in permanency could be met through a permanent guardianship. On de novo review, the Court of Appeals weighed the facts differently, and, putting more emphasis on child's need for permanency, permissibly reached the contrary conclusion. We allowed mother's petition for review and also review the record de novo ; we are not bound by and need not *1112 defer to the conclusion reached by either of those two lower courts. See Haguewood and Matter of Marriage of Haguewood , 292 Or. 197, 202-04, 638 P.2d 1135 (1981) (conducting de novo review without deference to conclusions reached by trial court or Court of Appeals). In Haguewood , this court reviewed the lower courts' decisions about equitable division of marital property; termination of parental rights was not at issue. Nevertheless, that case includes teachings material to the task at hand-that de novo review may consist of more than the "relatively simple, straightforward process" of "[f]inding facts anew on the record" and may encompass a "more complex" weighing of the facts according to applicable principles. Id. at 199, 638 P.2d 1135. In this case, as in Haguewood , both lower courts went about their tasks "with intelligence and sensitivity." Id. at 204, 638 P.2d 1135. We fault neither, but reason differently from both.
We begin with the evidence presented regarding child's need for permanency. MacPhail's testimony and report described the kind of permanency child needs: a consistent and reliable caregiver who offers a high level of consistency, stability, and routine; a caregiver who can advocate for child in both educational and community settings; a caregiver who can expose him to language-rich activities **164 to develop his language skills; a caregiver who can take him to appointments; and a caregiver who can provide a permanent living situation. Blackwood seemingly agreed with that assessment, stating that, to enable child to progress, he needs to know where he is going to live and who is going to take care of him on a day-to-day basis. Both witnesses testified that child could not wait for mother to engage in additional treatment and recovery before he was placed with a permanent caregiver, and we agree. The real question the lower courts had, and which we must confront, is whether a permanent guardianship can fill that need.
To analyze that question, it is necessary to understand the statutes that pertain to permanent guardianships. The grounds for granting a petition for permanent guardianship are the same as those for termination of parental rights. ORS 419B.365(2).[11] A court may grant such a petition only if it finds that it is in the best interest of the ward that the parents never have physical custody of the ward. ORS 419B.365(3)(b).[12] Thus, it appears that, in this case, a court could not make child's foster parents his permanent guardians without finding that mother should never be his caregiver. To the extent that the lower courts considered a permanent guardianship a temporary arrangement that would permit mother more time to obtain treatment and prove herself a fit caretaker, they were mistaken. A permanent guardianship is not intended to serve that purpose. To the extent that the Court of Appeals instead considered a permanent guardianship as an arrangement that would permit mother to bring later legal challenges that would not be available to her if child were adopted and was concerned about the lack of long-term permanency that would therefore exist, we acknowledge that permanent guardianship and adoption may differ in that respect. We do not assign significant weight to those differences here, however.
**165 First, a parent may not file a motion to vacate a permanent guardianship. ORS 419B.368(7).[13] Although a court may vacate a permanent guardianship on its own motion or the motion of a party other than a parent, ORS 419B.368(1), the court's decision to do *1113 so must be in the child's best interests, ORS 419B.368(2).[14]
Second, there is no evidence in this record that child's need for permanency is a need to have legal assurance that no court will ever change his placement. The witnesses testified that child's need is a need to be placed with a permanent caregiver without further delay. This is not a case in which there was evidence, for example, that child feared that mother would not accept his uncle and aunt as his permanent caregivers or that child would be harmed if a court were to make a different decision about his best interest in the distant future. The evidence suggests that the immediate security that child needs can be provided through a permanent guardianship.
Third, there was substantial evidence in this case that child had an interest in maintaining his relationship with his mother and his larger maternal family. As noted above, the juvenile court found that child "has a good albeit very limited relationship with Mother." That finding is supported by evidence that child is excited to see mother during visits and has a difficult time separating from her when the visit ends; he typically sits next to mother, without prompting, when the family takes photos. Child's maternal grandparents are significantly involved in his life; they spend a lot of time with child, including going to the library and the YMCA. Child's grandparents, his foster parents, and his mother are all "working together" for child because "family is very important to them." We give that evidence significant weight.
**166 The same is not true, however, of the juvenile court's suggestion that preserving mother's parental rights might "be an incentive" to her. An assessment of a child's best interest must be child-centered. If a decision that serves a child's best interest also happens to serve a parent's interests, then so be it. But termination may be appropriate even if a parent has a good chance of eventually succeeding in treatment and even if termination would dash a parent's hopes. On de novo review, we do not consider the effect that termination would have on mother; we focus solely on its effect on child.
Although we, like the lower courts, recognize that child has an urgent need for a permanent caregiver and should not be required to wait longer to see if mother can fill that role, we also recognize that child is attached, not only to his foster parents, but also to mother and her family. We do not defer to the juvenile court's conclusions that termination of mother's parental rights is not in child's best interest, but we do draw confidence from its experience, knowing that it often has pondered how best to protect children. We conclude, as did the juvenile court, that there is a way to meet child's need for a permanent caretaker without sacrificing his interest in maintaining his maternal family relationships and that termination of mother's parental rights is not in his best interest.
The decision of the Court of Appeals is reversed. The judgment of the circuit court is affirmed.
Balmer, J., concurred and filed an opinion.

Both the juvenile court and the Court of Appeals stated their conclusions about child's best interest in terms of whether the department had proved that termination was in child's best interest by "clear and convincing" evidence. See ORS 419B.521(1) (facts on which termination is based must be established by clear and convincing evidence). In this court, neither party argues that that standard of proof is determinative.

ORS 419B.504 provides, in full:
"The rights of the parent or parents may be terminated as provided in ORS 419B.500 if the court finds that the parent or parents are unfit by reason of conduct or condition seriously detrimental to the child or ward and integration of the child or ward into the home of the parent or parents is improbable within a reasonable time due to conduct or conditions not likely to change. In determining such conduct and conditions, the court shall consider but is not limited to the following:
"(1) Emotional illness, mental illness or mental retardation of the parent of such nature and duration as to render the parent incapable of providing proper care for the child or ward for extended periods of time.
"(2) Conduct toward any child of an abusive, cruel or sexual nature.
"(3) Addictive or habitual use of intoxicating liquors, cannabis or controlled substances to the extent that parental ability has been substantially impaired.
"(4) Physical neglect of the child or ward.
"(5) Lack of effort of the parent to adjust the circumstances of the parent, conduct, or conditions to make it possible for the child or ward to safely return home within a reasonable time or failure of the parent to effect a lasting adjustment after reasonable efforts by available social agencies for such extended duration of time that it appears reasonable that no lasting adjustment can be effected.
"(6) Criminal conduct that impairs the parent's ability to provide adequate care for the child or ward."

ORS 419B.500 provides, in full:
"The parental rights of the parents of a ward may be terminated as provided in this section and ORS 419B.502 to 419B.524, only upon a petition filed by the state or the ward for the purpose of freeing the ward for adoption if the court finds it is in the best interest of the ward. If an Indian child is involved, the termination of parental rights must be in compliance with the Indian Child Welfare Act. The rights of one parent may be terminated without affecting the rights of the other parent."

Beasley addressed an older version of ORS 419B.500 and 419B.504, in which the two provisions above were originally combined. Former ORS 419.523 (1991). In 1993, the legislature recodified the statute in S.B. 257 to its current form. The move made "no substantive change in the law." Exhibit B, Senate Judiciary Committee, S.B. 257, Feb. 15, 1993 (testimony of Judge Stephen B. Herrell).

Before the Court of Appeals, the department relied in part on a statement from this court's decision in Geist , 310 Or. 176, 796 P.2d 1193, in arguing that a presumption exists. There, the court stated:
"Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time so as to provide such an environment, the best interests of the child(ren) generally will require termination of that parent's parental rights."
Id. at 189, 796 P.2d 1193. In this court, the department does not cite Geist for that proposition. As mother notes, Geist concerned whether the mother in that case could challenge the adequacy of her counsel on direct appeal, id. at 179, 796 P.2d 1193, and the statement referenced above was made in the context of explaining why the standard to determine adequacy of counsel in juvenile dependency cases should not be the same high standard used in criminal cases, id. at 188-89, 796 P.2d 1193. In other words, the statement was not integral to the court's holding in that case. See Engweiler v. Persson/Dept. of Corrections , 354 Or. 549, 557, 316 P.3d 264 (2013) (stating that dictum has no precedential effect). Moreover, the statement was based, not on any Oregon authority, but on a single case from another jurisdiction. For those reasons, we do not find the statement in Geist to be instructive or binding on the issue presented here.

ORS 419B.365(2) provides that the "grounds for granting a permanent guardianship are the same as those for termination of parental rights."

ORS 419B.365(3) provides that the court "shall grant a permanent guardianship if it finds by clear and convincing evidence that:
"(a) The grounds cited in the petition are true; and
"(b) It is in the best interest of the ward that the parent never have physical custody of the ward but that other parental rights and duties should not be terminated."

This court has allowed review of a case in which a parent successfully moved to dismiss jurisdiction and thereby ended a durable guardianship without seeking to have that guardianship vacated under ORS 419B.368. Dept. of Human Services v. J. C. , 289 Or. App. 19, 407 P.3d 969 (2017), rev. allowed , 362 Or. 389, 411 P.3d 380 (2018). We do not intend to comment on that case here.

ORS 419B.368(2) provides that a court "may modify a guardianship order if the court determines to do so would be in the ward's best interests."